May it please the Court. Good morning. Joshua Bacharach, representing the appellant Reliant Standard Life Insurance Company. I'd like to reserve five minutes of time for rebuttal. We're appealing the district court's decision in favor of the plaintiff on this ERISA disability benefit case. There are two significant errors committed by the district court which led the court to arrive at its decision. The first is the court applied the treating physician rule. As we now know, according to the Supreme Court, that rule does not apply in ERISA cases, and I'll address that more later. The big issue here is the court's refusal to look at this case under the arbitrary and capricious standard, even though this plan grants discretionary language. The court did so because the decision was rendered after 120 days. So the question here before this court is, how does Jebion II affect that? In Jebion II, this court stated that when the plan states that a decision will be rendered in a certain timeframe, and it's not, it is deemed denied. But in this case, we don't have the plan having that language in it. We have, though, the ERISA regulations. And the ERISA regulations state that a claim must be decided within a certain period of time. So I guess the big question here is, answering what was reserved in Jebion II, does it matter? Well, you know, it's a matter of just common sense. The regulation says exactly the same thing as the language in the plan in Jebion. I don't get why, I mean, you're obliged to follow the law, right? So if Jebion's right, okay, if, and if the Supreme Court does not take cert, neither of which I think is correct, then what's the basis for your argument? That's not particularly my argument. My argument here is that the Court looked at this as, here's a fine, a bright line here. You're late, you lose discretion. Well, I know, but if Jebion turns on the plan, the plan language is precisely the same as the regulation. Why is the regulation, why does the regulation have any different effect on the standard of review than if it had been in the plan? I may not disagree with you, but here's the interesting thing. The regulation in effect at the time of this claim did not include the deemed denied language. That was added to the 2,000 amendments. That deemed denied language does not appear for this specific claim. But the issue here is we already have law in our circuit on what happens if there's a procedural violation, and that's precisely this issue. In Blau v. Del Monte, in Parker v. Bank America, in McKenzie v. General Telephone, this Court has repeatedly stated that absent substantive harm to the claimant, there will be no substantive relief. Now, is this substantive relief, if you look at it, de novo instead of arbitrary and capricious? It gets close to it, but the more important thing is let's look at what these courts said. These courts also faced with procedural violations. In those cases, it was a failure to supply requested information. The courts didn't say we're going to review it de novo or even that that was an option. Under the law of this circuit dating back to the 80s, this Court said only that this violation is a factor to be considered in deciding whether the decisions are arbitrary and capricious. In other words, you don't need to go back to Judge Reimer's question, that you're making the argument that Judge Toshima made in dissent to Jebion, but if the Supreme Court doesn't overturn Jebion, aren't we obligated to follow Jebion, which says that the standard of review changes? We go to de novo. It doesn't say it changes automatically. Well, it says that if the decision is not made within 120 days, it's deemed denied, and at that point, we don't have to defer to the discretion of the plan administrator. You don't have to unless, and this is in the majority, the majority says there are still circumstances which will retain discretion, and that's consistent with every other jurisdiction that has adopted this deemed denied language as well. As long as it's not a significant departure in time and as long as there's this ongoing exchange of information, you're still going to keep discretion. I mean, the difficulty here is I have a very hard time understanding Jebion, okay? So in that respect, it's difficult to have this discussion. But if Jebion controls, I just don't understand how it makes a difference that the precise deemed denied language in the regs is not in the plan. Well, I think that we have to follow the – let me take a step back. If you're violating the term of a plan, that's serious. Whether you're violating the term that says – But it's equally serious, presumably, to violate Federal law. It is, but this Court has said that you have to show a harm to get relief for it. And what this Court, in four cases, three that I just mentioned, but there's another one dating back even earlier, this Court has said that it doesn't automatically entitle you to any relief. What you're doing, essentially, is we're saying here is something that is a procedural violation and the claimant's arguing it should change the standard of review. But what this Court's always said, that to change the standard of review, you must present evidence to show that it was a significant or a serious conflict and that the conflict motivated the act that occurred. But now we're not even looking to that factor, even though that's the law of this circuit. We're saying, oh, well, if it's a deemed denied, even though it is as much a violation of the regs as is the failure to disclose, we're going to look at it differently. And to me, that doesn't make sense. So I think you have to look at Jevian. And Jevian does say we're going to leave open the question of whether it's different. They specifically left open the question of whether it's different if it's just a regulation. And I submit to the Court that it is different because we have laws already, we have case law already in the circuit that explain what you do if you're claiming something should alter the standard of review. And those cases deal specifically with procedural violations. So we have the answer to this question. And the answer is, it is still the claimant's obligation to prove it's a serious conflict and that it was motivated by the conflict of interest. All right. Let's move on to that, then, because the district court alternatively found that your client did suffer a conflict of interest in its refusal to comply with the treating physician rule. Well, before I get to that point, Your Honor, with respect to this part, the Court said that the late decision was not material evidence of a serious conflict. Now, going to the treating physician rule, you're right. The Court relied heavily, heavily on the treating physician rule in finding in favor of the claimant. And that's wrong. We know that that's wrong because the treating physician rule is no longer valid in ERISA cases. But if I can for one second, Your Honor, go back to this point with the deem denied. JABI even says that it's not a clear cut, you lose discretion. JABI even says if there's an ongoing investigation, you retain it. And that's what happened here. My client issued a decision, albeit the first one was a little bit late. But then they realized, we forgot to send documents that were requested by the claimant. And my client said, if you would like, you can submit new information to us and we are going to open our investigation up again. And they did just that. She submitted information. Not only did Ms. Gaddy submit information, that was most of what the Court relied on in reaching its decision. That is the ongoing investigation that no matter whether JABI in two applies or not, you don't lose deference because we want plans to accept evidence. We want to encourage them to continue to review a claim if there's new evidence. But didn't the district court rely on that new evidence in its decision? And that's part of my problem, too. We got doubly punished. Not only did the district court say you are deem denied and you lose discretion because as soon as that date passed, it's over. But then the Court said, but I'm still going to look at the new evidence. That doesn't make sense. That's why these courts such as Gilbertson and the Tenth and JABI and Muir. Alito, let me see if I can make – if the district court applied a de novo standard of review, there's nothing precluding it if it decides to consider the additional documentation in deciding de novo whether or not the plan administrator's decision was correct, is there? Yes, there is. Carney v. Standard Insurance Company, Baxter v. – I'm sorry, Mongaluso v. Baxter Travenol, all cases from this circuit which say even under de novo review, the record that exists at the time of the denial is the record that the Court should review absent extraordinary circumstances. But the Court found extraordinary circumstances here by saying, look, this was new information that the party wanted the insurance company to consider, and the insurance company actually considered it in the decision to reaffirm the decision to deny. So I'm going to look at it. What's wrong with that? What's wrong with it is if you're saying that you're allowing the administrators to open up the record again and have an ongoing investigation, and they make their decision on that ongoing investigation in a timely manner under JABI and two, you cannot lose your discretion. Well, what I hear you say is it would have been okay if the district court had relied on the information and upheld our decision, but because it applied de novo and overturned it, then it can't consider that evidence. That doesn't sound right to me. Not necessarily, no. No, no, that's not what I'm saying. What I'm saying is you have to review our decision under the arbitrary and capricious standard, heightened arbitrary and capricious. If you review it under the heightened arbitrary and capricious standard, I still don't think that – I do think, then, that that evidence will come in. And the court could have found against us based on that evidence under – not that I think that would have been correct, and I'll explain that later. The court could, though, have found against us based on that new evidence if applying the heightened arbitrary and capricious, because then we reviewed it and we issued a decision based on it. But to say that you're deemed denied, bam, you missed the date, therefore it must be de novo, that's not what JABI and two says. JABI and two does not hold that you missed the date, you're automatically de novo. And that's what the district court here said. Where do you get that out of JABI and two? Because, I mean, I just read it to make a flat statement that deemed denials are not exercises of discretion. That's in JABI and one. In JABI and two, the court – and I can find it for you – the court cites the decisions from on the surface. Yeah. And what the court is saying is – I'm going to make sure I stay in the majority, too, by the way. The court is saying on page 1106, and it goes through 1107. That's where I was reading from. And it's talking about Gilbertson from the other circuit. And then we get to the line, and it's on 1108. I apologize. Hence, administrators in substantial compliant have no need to rush to judgment. We also note that even for timely denials on the merits, it's an abuse of discretion to render decisions without any explanation. So what they're saying is if you're looking at it and you're deciding it on the – if you have an ongoing investigation, you have to read in the context. They've just cited Gilbertson, and they're just saying that even if you miss, as the Tenth Circuit recently noted in Gilbertson, it's designed to promote a good-faith bilateral exchange of information on the merits of a claim, not a hasty decision-making by administrators so as to slip under the 120-day wire or delay by claim so as to ensure a deemed denial. So what they're saying here is look at Gilbertson. That's what they hold. And in the very next line, very next section of the opinion, continuing on that, they're saying they're saying. So they didn't mean what they said right before that discussion. Deemed denials are not exercises of discretion. That's the problem I'm having. I read what the language they used earlier in the opinion, and that's obviously why it's up. Let me ask you another question, since we're on Jevian. Sure. Does it make sense for this Court to defer submission of this case to see whether the Supreme Court in fact does take cert? I think if this Court agrees with me that you have a different issue when you're dealing with a procedural violation because of the law that already exists in this circuit, then no, we don't have to. If we think that there's no difference between a deemed denial under the regulation and a deemed denial under the plan, then it would make sense to defer. But we have other issues here, don't we? We have the treating physician rule. Well, that one seems fairly clear. I mean, I'm sure, I'm sure. But I think what the Court – even the way the Court applied that one. The questioner will disagree, but. Even the way the Court applied that one, it used the same, I must look at this thing, it's a bright line, you either fall on one side or the other. The plaintiff submitted something from her doctor saying that it's due to – due to chronic hepatitis, not bipolar, therefore, I must find her in favor. And that's wrong. Even under de novo review, that would be wrong. And I think you have to look at the evidence in this case. The issue here was she's claiming fatigue. Fatigue is the sole basis for a disability claim. She had chronic hepatitis. In 1997 or so, her serum tests revert to negative and continue that way. She has three hospitalizations in 1997 and 1998 for bipolar disorder with manic episodes. We have her own treating psychiatrist saying she's got bipolar disorder. And one of the features of that is fatigue. We also have Dr. Sampleiner. My client goes to her treating doctor, her doctor treating her for hepatitis and says, what's the cause of her fatigue? Is it the hepatitis or is it the bipolar? And he says, I can't answer that question for you. This is the tale of two claims. Because then when we decide the claim based on this issue and we say, you know what, this plan limits benefits to 24 months for mental illness. It specifically includes bipolar. We do that and the doctors change their opinions. Dr. Sampleiner now says, well, I'm looking at Dr. Record's change in her opinion, so I rely on her. You have Dr. Record who said bipolar. Sometimes she question marks it, but she says bipolar. And now all of a sudden she's saying it's not bipolar. What you also have here is Dr. Rice telling my client one thing and then looking at his office notes and we see something else. Dr. Rice tells my client it is due to physical illness, not mental. And then you look at his own treatment notes, the same period of time, days later, he's saying it's mental illness, not physical. Why? Because he's trying to help out a claimant here. And that may be what he's supposed to do as a doctor, but we don't do that as a doctor. We don't do that as lawyers or judges. Mr. Bacharach, if we don't defer submission on this case, the problem I have is that if the Supreme Court tells us that we're wrong on the standard of review in Jebbion, then the argument you just made may very well save your client's decision if the review is abuse of discretion. But I'm not quite sure how all those facts would play out under a de novo review. But don't we really need to know from the Supreme Court whether they're going to take Jebbion? Because otherwise, we send this thing back to the district court, it can't do anything until the Supreme Court decides that case and tells us which standard applies when the decision is after 120 days. It's a good point, but I would say that Jebbion leaves this Court that decision. Jebbion says, we leave it to another day to decide whether a procedural violation means the same. And I'd like to think that the decisions from this Court earlier on procedural violations say that it's a different situation. But, of course, we don't know how narrowly or how broadly, if the Supreme Court does grant cert, it will write in this area. So maybe the Supreme Court will answer that question. And you know, Your Honor, maybe you're right. Maybe this matter should be taken under submission and waited until after that decision, because it may why should you devote an opinion to something that may be moot. I agree. Okay. I'd like to reserve the rest of my time. Thank you. Ms. Kershner. Your Honors, I'm Barry Kershner on behalf of a pallee, Terry Gotti. Terry Gotti has now gone 4 1⁄2 years since receiving any benefits. One purpose of the underlying regulations that we are here discussing in part today is to make certain that people who are entitled to their benefits with valid claims do not have to wait forever in connection with receipt of their money, and that they don't get it posthumously or after it becomes a meaningless event for them. Before we discuss the Jebbien issue, which apparently is on everybody's mind, I'd like to remind the Court, please consider, that it doesn't make a difference what you say about Jebbien because there's no evidence to support the Respondent's claim that the Supreme Court's 22-page order found that there was no substantive evidence, no substantial evidence. Well, yes. The problem is he was either overwhelmingly or certainly greatly influenced by the treating position rule, which is wrong. Your Honor, there's no question that Judge Zapata found in our favor on the treating position rule, and the treating position rule has since been turned down by the Supreme Court of the United States. But if you look at Judge Zapata's order, pages 22 to 23 of it, and I believe it's 27 to 29, I may be off by a page there, what you will find is, and he did couch it in part based on treating position. I don't deny that. But what you'll find is that he found that Reliance Standard Insurance Company had found nothing, had supplied nothing to establish that the hepatitis which disabled Ms. Gotti and was undisputed between 1992 and 1997 had gone away between 1998 and 2000. Not only did they find nothing, there's no medical support. Well, let me break that down. In the original denial, which was, I believe, April 3rd of 2000, there was no medical evidence at all provided by Reliance Standard of any doctor who treated and considered or even reviewed, because they didn't have any. The only doctor who reviewed the decision for Reliance Standard was Dr. DeLuca, who did a neuropsych evaluation and basically concluded in Gotti's favor that she continued to be disabled by virtue of hepatitis. But even so, there was no medical support for the idea that she did not she was no longer suffering from hepatitis, to the extent that they attribute something to Dr. Record, treating for bipolar, Dr. Record is a psychiatrist, and Dr. Record never pretended to treat for hepatitis. So if she has in some of her, I think there's three times when in her notes mentioned something about remission. One says maybe, one says it waxes and wanes, one says I think she's not in remission. But in any event, Dr. Record is a bystander. Dr. Record does not treat and does not analyze whether she, whether Terry Gotti continues to have hepatitis. Dr. Rice says, yes, she continues to have hepatitis and it is disabling. Dr. Sampleiner says, has asked the leading question, you know, the he's still beating your wife question, when did she stop suffering from disabling fatigue from hepatitis, and he says I can't answer that. And he says quantify how much of the fatigue is caused by this and how much is that. He says I can't, I can't answer that either. So what you have is Dr. Rice, the treating physician, taking a very clear stand. Dr. Record being uninvolved in any diagnosis or treatment of hepatitis, and Dr. Sampleiner saying I can't quantify anything. And there's no, the only medical record or medical personnel brought into the situation by reliance standard at that point in time, other than their adjusters who are not trained, is Dr. DeLuca, who says, yes, it's hepatitis, and the, and remember, the psychiatric or psychological problems she's having date back to hepatitis. We're talking about someone who does not have a psychiatric history prior to the onset of the disabling fatigue and hepatitis in 1992. Now, I'm saying is chronologically what we have, Your Honor, is. Kennedy, that's coincidental. I'm sorry. That's coincidental, not causative. It could be coincidental, and it also could be. Do you have any expert testimony saying that the hepatitis B caused her bipolar disorder, which caused her fatigue? No, I believe there is testimony in the record, Your Honor, which basically says that it would be unusual for a chronic disease, physical disease, to not have some psychological byproduct, but it does not address. Some psychological byproduct. It could be delusional, it could be neurotic, it could be bipolar. There are many things. That's correct. I think you've answered my question. Okay. After the appeal, well, after the original denial, which was, I believe, April 3rd, Terry Gotti, acting on her own behalf, unrepresented, sends a letter on April 22nd, I believe the letter is dated. It's acknowledged by reliance standard on May 3rd, but the date of the letter is April 22nd. And she does two things. She provides some medical information from Dr. Record. She provides some medical information from Dr. Rice. She provides some article, and she also asks, as is her right, to be provided a copy of the claims file, because, as the Seventh Circuit described in the Halpin case, in order to do an appeal, it's certainly handy to know the record that you're appealing from and what the insurance company has accumulated. Unlike some of the other cases and some of the other circuits, where there is an ongoing good-faith dialogue about, well, have you gotten this additional record, or whatever, what happens is reliance standard does nothing for six months. They do not answer Ms. Gotti's request for documents. They send about three months later something that says it's going to take us longer than 60 days, and that's it. For six months, they do nothing. Now, they have no response from Ms. Gotti. When you read – I'm going to mix my arguments a little bit with Jevian, Your Honors. When you read Jevian and you see some of the cases which have some distinguishing characteristics, some cases like McGarrett on the Eighth Circuit, Gilbertson and Finley in the Tenth Circuit, when you see a description of an ongoing good-faith dialogue, generally what they're talking about is in that 120-day period where the regulations say you must decide this case, whether there is a dialogue between attorney, between one side and the other. Here you have nothing. Reliance standard sees that she's not represented. She's asked for information which would help her appeal, and they do nothing. They do nothing for six months. And not only do they do nothing for six months, by the time they give her the information that she says – that she's requested, they've already denied the claim. They denied the appeal. And even in the language which says you can submit some additional information, they say out of the goodness of our hearts we're giving you this extra time because we didn't give – they aren't even saying that she's entitled to it. What happens in that interim period, they consult with a doctor named Fagan, who doesn't treat patients and who's in Atlanta, and who does a paper review. And Dr. Fagan says two things, really, of import. One is that he agrees with the comments of Dr. Rice and Dr. Sampleiner, that even though the muscle enzyme tests have normalized beginning in either late 1997 or early 1998, that it is not really a correlative thing that these tests mean that she no longer suffers from hepatitis. All the doctors who are on record, Dr. Rice, Dr. Sampleiner, and even Dr. Fagan, agree that the reversal of the muscle enzyme test from positive to negative is not indicative of no longer having hepatitis. But then he goes ahead and in the conclusion of his – of his report basically says, on the other hand, it's been two and a half years since the muscle enzymes tests have normalized, and she has these psychological problems, so she must not have hepatitis anymore. Okay? That's the only medical support, aside from a justice-giving opinion, that's the only medical support that they have in their record. Now, what happens is – Kennedy. Doesn't that create an issue of fact, then? Mann. Excuse me? Kennedy. Doesn't that create an issue of fact? That's up on a motion of summary judgment, right? Mann. Well – Kennedy. It's a tribal issue of fact. Mann. For the reasons – I don't think so for these reasons. And let me – I mean, if you have her being tested, and her tests go from positive to negative, and then there's a period of time when they're negative, and then she gets fatigued again at the same time of a bipolar disorder diagnosis, a trier of fact could find that her hepatitis got better, she didn't have fatigue, then she got bipolar, and she did have fatigue, and fatigue is what the disability is.  I believe so, Your Honor. But let me go ahead and address what Judge Zapata found. Number one, he was given the authority by both sides to rule – to rule as a trier of fact as opposed to on summary judgment on the record that was before him. Number two, what Judge Zapata said is, in light of the evidence which was then submitted, which was the DNA testing of September 2000, Dr. Rice submitted in his December 7th letter, it's referred to at page 12 and 13 of Judge Zapata's opinion with the DNA – with the DNA results, saying, I've told you that the – since 1992, this woman has been disabled. Now we have new objective evidence that establishes that this test was not available before, it's important, it's the DNA testing, we know it in other fields, it's a very prominent and recent advance in science. And he says this establishes that she has active viral replication, this woman still saying, and there's objective proof of it. Now, curiously, Dr. Fagan basically had said, and Reliance Standard had said, well, you know, with the muscle enzyme test, there's no – there's no objective proof, so as long as they felt that there – that it was an impossible burden, kind of a catch-22, you have to prove something that's impossible about what's causing the fatigue or how to do it. You know, they were very happy with the objective – with saying there's no objective evidence. As soon as they get objective evidence on – directly on point by the DNA test, they go ahead and they say – not only do they say it's not relevant, they take the decision by an adjuster. They take the decision without even showing it to any doctor, Dr. Fagan or anybody else. And what Judge Sopatra ruled below, I believe correctly, is that in light of that, there is no – Dr. Fagan's evidence becomes meaningless. I mean, Dr. Fagan's opinion, which is suspect in the first place for, among other reasons, that the same basis that he says she's not – she's not suffering from hepatitis anymore on the other – you know, elsewhere in his opinion, he said that these muscle enzymes tests that show normalization is not unusual. It's not unusual. Kagan. Let me just interrupt for one second and ask you a question. You know what? We don't even have a full administrative record. If the case has to go back for any reason, why shouldn't this be an exercise that the district court goes through in the first instance instead of us? Well, Your Honor, four-and-a-half years of no benefits is an important matter. But I understand that, but I think it might take me four-and-a-half to order the administrative record and to go through and figure it out. I mean, as much as I love being a district court judge, and I do, it's not the current job description. Well, Your Honor, my argument to this point in time is essentially focused on why I believe this Court should affirm directly without sending it back to anybody under any standard. May I ask you a question on that? You made a reference that it was somehow agreed that Judge Sepada, on the motions for summary judgment, should abandon the role of a district court judge ruling on a Rule 56 motion of summary judgment and try the case as a trier of fact. Did I understand you correctly? Because I don't see anything here other than he was ruling on motions for summary judgment. No. Actually, I believe if you look at the last or next to last page of Judge Sepada's opinion there, that the parties had agreed that if there were no summary judgment that the summary judgment standard had not been met, that the parties had agreed to provide the case for his determination as if he were a trier of fact on the record. So I'm not saying that the summary judgment should be abandoned, but what I'm saying is that there's an alternative basis to uphold Judge Sepada's opinion in connection with the grant that had been given by the parties. The parties agreed to change the standard by which Judge Sepada should view the evidence. And where is that on page what? The second one. Excuse me, Your Honor. I think it's on page 30. That's where it says judgment on the record, just before the conclusion. Yes, Your Honor. It's page 30, paragraph E, judgment on the record. Your Honor, I'd like to go a little bit to Jebbian now. The question in Jebbian from a more philosophical matter is, if a fiduciary is a fiduciary required to follow the law, and if a fiduciary does not follow the law, is there any consequence to his not following it? The issue in the facts in this case are similar to the facts in Jebbian in at least this respect. In both Gotti and in Jebbian, after the deadlines had been exceeded, the deadlines had been blown by the plan administrator. But in Jebbian also, the court, the Ninth Circuit and the trial court considered the substantive opinion of the appeal from the plan administrator. In other words, what happened in Jebbian was there was an excess of time taken. It was much too long. The party filed its litigation. And then the plan administrator went ahead and filed its final order denying the appeal, and that's what was considered. The question was whether that would be given deference, and that's exactly comparable to what we have here. After they had blown their deadline at reliance standard by ignoring this whole thing for six months, ignoring Ms. Gotti's request, ignoring their obligations, eventually there was additional documentation that was submitted, and they denied it again. And that was an order that was reviewed by Judge Zapata. So we are precisely in the same procedural position as Jebbian, and if Jebbian is correct, as I believe it is, that's where we are. The reliance standard is now asking to make a horrible, what would be a horrible matter of policy. Basically saying that the plan administrator would have the option of whether to follow the law, and if the plan administrator just did not follow the law at all, it would cause the claimant to be in this, in this. I'm sorry. The question is, what does that law mean? I mean, you heard me asking the question of your, of Mr. Bacharach. I mean, I don't see much difference between the same language being the plan and being in regulation. But there is a significant question about what deemed denial, what the consequences are, whether it has any effect at all on the exercise of discretion or what rather, whether it's just a default time for when the claimant can file an appeal. I mean, there are lots of ways to read the language, and that's what may be in front of the Supreme Court. So do you have a view as to whether we should wait or whether we should wait? Yes, Your Honor. I believe you should not wait. As I said at the outset of my argument, part of the reason there are deadlines on making decisions is there are real people who go ahead and have protections that they've bought and paid for, and the denial and delay of those protections have very real consequences. The Jebion is the law. The Jebion was the – this Court decided on Bank not to rehear Jebion or not to decide it on Bank. Well, yeah, but the Supreme Court is going to say in two weeks whether it's going to take cert or not. Well, I will say this, Your Honor. There's a big difference between a two-week extension and a two-year extension. And if I could tell you that I knew that the Supreme Court in a week was going to give the answer to the question, I would feel a lot more comfortable agreeing with the Court that maybe that kind of deferral should be made. But I am very concerned that a single mom who's gone through what my client has gone through should be sent back into the rabbit hole for another few years to the Supreme Court and get an award. Well, I think I made clear what I believe should be done. Your Honor, Jebion is in a strange case where because it was decided twice, it was Jebion I and Jebion II, the Tenth Circuit and the Ninth Circuit saluted each other in the Gilbertson case. The Jebion was cited favorably in Gilbertson, and Jebion II cited Gilbertson favorably in that opinion. And so it's a rare instance of collegiality, I guess, between the circuits, a rare opportunity. Or another argument for not amending opinions, if you can avoid it. Okay. But what it really amounts to is if you leave the claimant with the option of being ignored for six months and, okay, you can file your suit, but you can't introduce new evidence, that is a totally unsatisfying remedy. As a matter of fact, what it really is, is a reward for poor behavior and violating the law by the fiduciary. The fiduciary here went six months without either following its obligation to render a decision or, in some respects, even more importantly, because who wants to do an appeal without knowing what the record is? It just ignored the request of a pro-proclaimant. She wasn't represented. They didn't take her seriously. And six months went by. The fact that between October 27th and February 6th there was back and forth does not excuse the six-month delay. The cases which address this, whether it's McGarrett or Gilbertson or Finley, and they all, in some respects, do, and frankly, they're all getting mixed up in my head, it is very clear that waiting six months and doing nothing is not the type of good faith dialogue that would excuse anything. And it's also very clear that unlike in Finley and McGarrett, the evidence that was presented by Gotti was very significant, not simply something which wouldn't change anybody's mind anywhere. I believe I'm out of time. If the Court has any questions, I'd be glad to stay. All right. Thank you, counsel. The matter just argued will be submitted. No, I'm sorry. Excuse me, Mr. Bacharach, you have time for rebuttal? Counsel stated that it leaves the plaintiff in a position where she doesn't know what to do, but that's not the case. She could have filed her suit. She would have had a very strong argument that it was deemed denied when that 120th day passed. It would have been de novo, and then the Court could have said, you know what, this evidence could not have been provided earlier under Carney. I can now look at it, which was your point, Your Honor. So she has something she could have done. She availed herself to an ongoing investigation. Therefore, she has waived the right to argue that it's deemed denied. The counsel had mentioned that there was no change in the evidence and that the doctors were all saying that her claim was due to physical disease. That's not true. I mentioned to you all the records that were there before. Dr. Recker didn't say anything about hepatitis. We didn't rely on him. We relied on Dr. Sampleiner saying that he couldn't tell us what the cause was. We have this issue of the DNA testing. This was a report by Dr. Rice. Dr. Rice didn't even treat her for hepatitis. He was the family doctor. Dr. Sampleiner was the hepatitis doctor. And he's actually listed as the referring doctor. So why should he comment? Kennedy, can we agree that the DNA test is more accurate as to whether or not she continues to have hepatitis B? How do we know that? Because we don't even know that there is active viral. That's what Dr. Rice says, but that's not what's listed on the report. That's not listed on the report. It doesn't say it. It just has certain numbers. And that's Dr. Rice's interpretation. And we have to wonder, is he even qualified to offer that? But let's assume he is right. Let's assume that. She provides us with an article on chronic hepatitis. And what that article says is you do not diagnose chronic hepatitis based on one test. What you have to do is you have to look at other factors. There are certain criteria. And persisting liver disease is the first one they mention. She doesn't have it. It says it's characterized by positive serum tests. Well, hers are all reverted back to negative for a number of years. In fact, it talked about that test as the hallmark of chronic hepatitis. The hallmark of it. That's its words in the article. Alito, what's your response to the argument on page 30 of the record as to what the parties stipulated to do before Judge Zapata? Under de novo review, under Carney, the Court can look at it as a motion for judgment on the record. The Court can. Under arbitrary and capricious, which I submit is what this what should have been looked at, then you can't. Because in that case, the question is this. Is there a reasonable basis in the record for the decision that was made? And as long as there is, it has to be affirmed. So there is no fact-finding under arbitrary and capricious standard. So you agree that if Jebian is the law and if de novo review applies, then what Judge Zapata said is correct, that he can decide issues of fact correct. Does that mean he should his earlier decision should be rubber stamped, as counsel has asked you? Of course not. He applied the treating physician rule. It can't be. Thank you, Your Honor. Thank you. Thank you, counsel. The matter just argued will be submitted. And we'll hear argument in Merklin v. Liberty of Life.
judges: Rymer, Tallman, Bea